Templeton Appeal.

Argued January 6, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

*Edmund P. Turtzo,* for appellant.

*James R. Charron,* with him *James F. Pritchard,* for appellees.

OPINION BY MR. JUSTICE EAGEN, March 22, 1960:

The appellant, Wilford L. Templeton, was employed as chief of police of Wind Gap Borough, Northampton County, from May 16, 1953, to May 10, 1958. He was discharged by the vote of the borough council. The Court of Common Pleas of Northampton County dismissed Templeton's appeal from this action. It concluded that, regardless of the merit of the reasons upon which his dismissal was based, the office of policeman and/or chief of police in the borough had never been legally created; that his appointment to the post was, therefore, invalid; and that, as a result, no legal right to continue therein existed. The question of the correctness of this ruling is now before us on appeal.

The historical facts of the case disclose that Templeton was first suspended by verbal order of the burgess of the borough. The latter subsequently filed a "Written Statement of Charges" against the appellant with the borough council, charging neglect of duty, inefficiency, disobedience and misconduct. The borough council passed a resolution adopting the charges made by the burgess. The charges were denied by appellant. A public hearing followed, at the conclusion of which members of the council voted unanimously for dis-

missal, in effect upholding the charges instituted by the burgess, but without making any specific findings of fact. Templeton filed his petition for appeal with the lower court. Months passed. Oral argument on the issues at that time raised was then had. At this juncture, and before the court's adjudication had been entered, certain taxpayers of the borough were permitted to intervene in the action, over the objection of the appellant, and in their petition seeking this right the question of the legality of appellant's appointment as chief of police was raised for the first time. At the hearing on the petition to intervene, this question was litigated and it was stipulated by the parties that "there is no ordinance of record in the Borough of Wind Gap establishing a Police Department."

The lower court, as hereinbefore related, sustained the action of dismissal without determining whether or not the charges against the appellant were proven, and based its legal conclusion completely on the finding that Templeton had not been legally appointed in the first instance and, therefore, was not entitled to the protection of the provisions of the police tenure Act of June 15, 1951, P. L. 586, 53 PS §§811-815. The propriety of this ruling is well supported by many prior decisions of this Court.

If the appellant upon the date of his dismissal enjoyed a legal right to the office of policeman or to the office of chief of police of the borough involved, he was entitled to the full protection and security of the tenure established by the Act of 1951, supra. Under the provisions of this statute, he could not, if entitled to the office, be removed at the pleasure of the power by which he was appointed. His dismissal or suspension could only be brought about legally by the filing of charges, statutorily specified and enumerated in Section 2 of the Act of 1951, supra. If a public hearing were requested, such would be his legal right and, in order to

impose upon him the severe penalty of suspension or dismissal, proof of the charges to sustain such action would have had to be clear and convincing: *Vega Appeal*, 383 Pa. 44, 117 A. 2d 736 (1955).

However, to establish his legal right to the position involved he had the burden of proving the legality of his appointment thereto. Upon him rested the responsibility of establishing his title de jure to the position he claimed the legal right to hold. Permanency of tenure, given by the Act of 1951, applies only to those whose appointments are made in compliance with law: *Manning v. Millbourne Borough Civil Service Commission*, 387 Pa. 176, 127 A. 2d 599 (1956).

Unfortunately for the appellant, he failed to meet this requirement. As stated before, his counsel stipulated before the court that the official records of the borough fail to show the existence or passage of any ordinance establishing a police department for the Borough of Wind Gap. Proof that his own personal appointment was effected by any borough legislation was also lacking. This is fatal. The creation of a borough police department or force is a legislative function. Such may come into being only through legislative enactment, viz., passage of an ordinance: *Miles v. Borough of Houston*, 3 Pa. D. & C. 2d 793 (1955); *Shady v. Wyoming Borough et al.*, 78 Pa. D. & C. 584 (1951). The Borough Code of July 10, 1947, P. L. 1621, §1006, as amended by the Act of July 19, 1951, P. L. 1026, 53 PS §46006, provides, "The Legislative powers of boroughs . . . shall be exercised by or be based on an ordinance." Section 1125 of said Code specifically provides for the manner in which a police department may be created and the method by which police officers may be appointed: "Borough Councils may, subject to the civil service provisions of this act, if they be in effect at the time, appoint and remove, or suspend, or reduce the manner of practice or exercise of the right, granted

in rank, one or more suitable persons, citizens of this Commonwealth, as borough policemen . . .

"The Borough may by ordinance establish a police department, consisting of chief, captain, lieutenant, sergeants, or any other classification desired by the council . . ." The word "may" in the above section does not mean, as appellant's counsel argues, that policemen may be legally appointed in some other manner. In addition, Section 3501 of the Code states that this statute provides a complete and exclusive system for the operation of the government of boroughs.

The fact that the appellant was employed as chief of police for five years does not, in itself, prove that he enjoyed title de jure to the position any more than it did in the case of *Manning,* supra, who served in the capacity of patrolman for three years. Mere proof of employment, without more, does not establish the legality of the appointment. "There can be no de facto officer where there is no corresponding office known to the law, or, as it is sometimes expressed, there can be no officer de facto without an office de jure:" McQuillin, Municipal Corporations, Vol. 3, 3rd Ed., §12.104, pp. 383 and 384.

Since from aught that appears of record the position of chief of police in Wind Gap Borough never legally existed, appellant has no standing to challenge his dismissal. In *Detoro v. Pittston et al.,* 344 Pa. 254, 25 A. 2d 299 (1942), this Court said at page 261: "An employment which in its inception violates such an act as this (Civil Service Law) is illegal and against public policy and it is the duty of the administrative officers of the state or its civil subdivisions to discontinue any illegal employment when they note its illegality. The illegality should not go unchallenged. In such case the defense is not waived by the action of the representatives of the municipality." In *Manning,* supra, Mr.

Justice CHIDSEY, speaking for the Court said, p. 183: "Since appellee (Manning) was never validly appointed as a patrolman, he is not entitled to the protection of the civil service provisions of The Borough Code."

Alone remaining for discussion is the legal propriety of the lower court's order allowing appellee-taxpayers to intervene in the action. Appellees principally rely on the Act of May 4, 1927, P. L. 519, art. XXXII, §3205, renumbered art. XXXIV, §3405, and amended by the Act of July 10, 1947, P. L. 1621, 53 PS §48405. Appellant refers us to Pa. R. C. P. 2350, and contends that subsection 17 thereof specifically denies to taxpayer-appellees the right of intervention given to them by the Act of 1927. Unquestionably, the section appellant cites does, to an extent, specifically "suspend" the pertinent section of the 1927 Act. But we are asked to hold that the substantive right of intervention, thus legislatively conferred, was in effect repealed by Rule 2350. We cannot, for several reasons, so conclude. We believe that a reasonable construction of the Act of June 21, 1937, P. L. 1982, as amended, 17 PS §61, which authorized this Court "to prescribe rules of *practice and procedure*" precludes our holding that this Court was thereby empowered to deny to parties substantive rights created by the General Assembly. This Court was authorized by said Act to suspend "the operation of any act of Assembly relating to practice or procedure (which is) inconsistent with such rule", but we fail to see how it could earnestly be contended that the Borough Code of 1927, as amended, was an "act relating to practice or procedure." The substantive right to intervene enjoyed, under certain circumstances, by borough taxpayers could not later be abrogated by rule of court. That being so, we conclude that this Court, in promulgating Rule 2350, did not intend to suspend the *right*, as contradistinguished from

by the Legislature. As stated in *Pittsburgh Parking Garages, Inc. v. Urban Redevelopment Authority of Pittsburgh,* 370 Pa. 578, 580, 88 A. 2d 780 (1952), "The procedural rules were not intended to change the substantive rights of the parties: Act of June 21, 1937, P. L. 1982, 17 P.S. Sec. 61, as amended." In this connection, we quote at length from *Coppage v. Smith,* 381 Pa. 400, 404 and 405, 113 A. 2d 247 (1955) : " 'Our modern procedure, as exemplified by the Rules of Civil Procedure, and particularly those governing the joinder of additional defendants, is to the effect that such rules should be interpreted liberally to accomplish their purpose, which is to further simplify and expedite the disposition of matters involving numerous parties with divergent interests.' In McKay v. Beatty, 348 Pa. 286-287, 35 A. 2d 264, speaking by our present Chief Justice, we said,—'Procedural rules are not ends in themselves but means whereby justice, as expressed in legal principles, is administered. They are not to be exalted to the status of substantive objectives. It is for this reason that Pa. R. C. P. No. 126 (332 Pa. lxvii) provides: "The rules shall be liberally construed to secure the just, speedy and inexpensive determination of every action or proceeding to which they are applicable. The court at every stage of any such action or proceeding may disregard any error or defect of procedure which does not affect the substantive rights of the parties" '. The foregoing was quoted with approval in Fisher v. Hill, 368 Pa. 53, 56-57, 81 A. 2d 860. Indeed, a lower court will not be reversed either for waiving or refusing to waive noncompliance with procedural rules in the absence of a showing of an abuse of discretion which has caused manifest and palpable injury to the complaining party: see Richter v. Mozenter, 356 Pa. 650, 654, 53 A. 2d 76." We feel bound by the just-quoted pronouncements by this Court in those cases and consider them to be sound in law and practice and to be re-

quired by the dictates of common sense. There has been no satisfactory showing of any such abuse of discretion in the instant case. Accordingly, we hold that the order of the lower court allowing the intervention of appellee-taxpayers was proper under the existing circumstances.

The question of the timeliness of the intervention is one singularly within the periphery of the trial judge's discretionary domain: *Darlington et al. v. Reilly et al.*, 363 Pa. 72, 69 A. 2d 84 (1949); Commentary, Goodrich-Amram, Civil Practice, §2329-4. We see no abuse in his action in this regard.

Order affirmed.

Mr. Justice COHEN dissents.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

There are some rights which do not depend on legislation for authorization and legalization. There is no statute in Pennsylvania which specifically states that any person attacked by another person may retaliate with force adequate to overcome the assailant, even to the point, if necessary, of taking life. Yet, that is the law of Pennsylvania, it is the law of America, it is the law of self-preservation recognized everywhere.

And what a man may do individually, a number of individuals may do collectively. In an organized society, the State may regulate, and indeed does regulate, the manner and the means of creating and maintaining police protection, but the State may not prohibit a community, which is otherwise unprotected, from providing its own means for self-preservation.

If the municipal authorities of any town, in supreme neglect of their solemn responsibilities, and in defiance of their pledged duties, fail to provide the means for protecting the people from lawlessness and violence and

maintaining peace in the streets, the people, as the sovereign power of the Commonwealth, have the inherent right to adopt any measures which are necessary to safeguard the lives and property of the population.

Section 2, Article I, of the Pennsylvania Constitution, declares, inter alia, that: "All power is inherent in the people, and all free governments are founded on their authority and instituted for their peace, *safety* and happiness." (Emphasis supplied)

Amendment IX of the United States Constitution reads: "The enumeration in the Constitution of certain rights shall not be construed to deny or disparage others retained by the people."

There was no necessity, however, for the people in Wind Gap to draw on their reservoir of constitutional powers to obtain police protection, since, on May 9, 1953, the borough government, acting by authority of council and burgess, appointed a chief of police in the person of Wilford L. Templeton. Although the council did not officially enact an ordinance authorizing employment of Templeton, it obviously knew of the appointment, ratified it, and never at any time questioned its reality, authenticity and legality.

The people of Wind Gap were also well aware of the appointment of Templeton as chief of police. No person in a small town[1] can be more conspicuous than the chief of police; and this was true particularly of Wilford L. Templeton. Although, under his contract of employment, Templeton was to work only nine hours a day, he actually was on duty from 15 to 20 hours every day seven days a week, even though he was entitled to a day's rest every week. And while this has no bearing on the issue in this litigation, it is interesting to note, as evidence of Templeton's loyalty to the

---

[1] The 1950 census gives Wind Gap's population as 1,577.

borough, that he never made any claim for overtime pay.

Not only was the Council of Wind Gap fully cognizant of Templeton's appointment, but it officially recognized his tenure by appropriating money for the payment of his salary.[2]

On May 10, 1958, Templeton was orally notified by the chief burgess that he was being suspended, and on May 31, 1958, he received written specifications of alleged defections in duty. Templeton formally denied the charges, and the council aired them by the taking of testimony, following which it ordered Templeton dismissed. Templeton appealed the dismissal to the court of common pleas, and the matter was formally argued by the attorneys involved. However, before the court rendered a decision on the appeal, a taxpayers' petition was filed averring that Templeton had no right to an appeal to the Courts because he was not legally the chief of police of Wind Gap. The contending parties stipulated that "There is no ordinance on record in the Borough of Wind Gap establishing a Police Department."

The court then held that it was unnecessary to pass upon the dismissal proceedings because, it said, "the office of policeman and chief of police in the Borough of Wind Gap was not validly created and that, therefore, Wilford L. Templeton was never legally appointed to said office."

In support of this conclusion, the court quoted from McQuillin's Municipal Corporation: "One who has been dismissed from an office which does not lawfully exist, in that it was not created by ordinance or other formal action, has no standing to challenge the action dismissing him."

---

[2] The salary was modest: $3200 per year from 1953 to 1955; $3600 from 1955 to 1956; $3800 from then until time of dismissal.

It will be noted in this quotation that an office may be created by ordinance or "other formal action." The definition of formal action would certainly include the proceedings of the borough council in appropriating funds for the payment of a policeman's salary, the expenditures of money for the purchase of police equipment, the scheduling of hours of duty and the formation of police routes. The council has done all these.

This Court now affirms the decision of the Court of Common Pleas of Northampton County and, in bolstering the affirmance, quotes Section 1125 of the Borough Code, as follows: "Borough Councils may, subject to the civil service provisions of this act, if they be in effect at the time, appoint and remove, or suspend, or reduce in rank, one or more suitable persons, citizens of this Commonwealth, as borough policemen . . .

"The Borough may by ordinance establish a police department, consisting of chief, captain, lieutenant, sergeants, or any other classification desired by council . . ."

After this quotation the Majority Opinion goes on to say: "The word 'may' in the above section does not mean, as appellant's counsel argues, that policemen may be legally appointed in some other manner. In addition, Section 3501 of the Code states that this statute provides a complete and exclusive system for the operation of the government of boroughs." I disagree with this conclusion. Section 3501 does not do what the Majority Opinion contends for it. The pertinent part of Section 3501 reads as follows: "It is the intention that this act shall furnish a complete and exclusive system for the government and regulation of boroughs . . ." This obviously only means that what is contained in the Code is authoritative, but it does not and cannot add to Section 1125 what is *not* there. Section 1125 still reads that "The Borough *may* by ordi-

nance establish a police department, etc." Section 3501 does not make the word "may" imperative when it is only declaratory. Section 3501 does not dress "may" in the armor plate of exclusivity. Section 3501 does not make "may" read "shall."

The conclusion, therefore, is obvious, namely, that the appointment of a police officer in a manner other than that outlined in the code is not prohibited by the code. But in any event, the Borough Code, complete as it may be, cannot immunize the municipality from liability arising under other well-established rules of law.

The Borough of Wind Gap was obviously very lax in enforcing its alleged right to dismiss Templeton on the ground that he had been illegally appointed. The municipality is just as amenable to the law of laches as any person or private corporation. The guiding beacon in Pennsylvania on the subject of governmental laches is the case of *Commonwealth ex rel. Atty. Genl. v. Bala & Bryn Mawr Turnpike Company,* 153 Pa. 47, where Chief Justice PAXSON, after reviewing the pertinent authorities, declared: "Were the complainant here a private individual we would not hesitate to say that his laches was a bar to this proceeding. Is the commonwealth in any better position? We think not. It is true the statute of limitations does not run against the commonwealth. But this is not a question of the statute of limitations. It is a question of laches, and *laches may be imputed to the commonwealth as well as to an individual.*" This rule of law was cited with approval by this Court as late as January 18, 1960, and the italicization was supplied by the writer of the opinion, Justice BENJAMIN R. JONES, in the case of *Com. ex rel. Storb v. Schroll,* 398 Pa. 354, 358.

In *Com. ex rel. Margiotti v. U. Tr. Co.,* 327 Pa. 497, we said: "Estoppel by laches may be asserted against the Commonwealth."

In *Ervin v. Pittsburgh,* 339 Pa. 241, we held that the City of Pittsburgh was estopped from denying the validity of verdicts entered against it with the consent of the city solicitor, even though the latter was armed with no authority to give such consent. Speaking through Justice MAXEY, this Court said: "The doctrine of estoppel is founded on considerations of sound public policy. There are circumstances in which the law will not permit a man to gainsay to the prejudice of another some act or statement of his, in reliance on which that other has acted . . .

"This court in Breinig et ux. v. Allegheny Co. et al., 332 Pa. 474, 485, 2 A. 2d 842, reiterated the principle that 'a municipality like a private corporation is subject to the doctrine of estoppel (citing cases) . . .

"Since municipalities are not immune against estoppels, the only question here is whether or not this record supports the estoppel invoked. . . . It would be difficult to find a situation more justly calling for the application of the principle of estoppel than the situation we have here. We cannot agree with the court below that 'the essential elements of equitable estoppel are not present in this case.' The Court said: 'None of the elements is present because there was no representation as to any *fact,* but merely a mistake as to the law, in regard to the authority of the City Solicitor to settle cases.' The court takes too narrow a view of the word 'fact,' which it italicizes. The 'fact' here represented for a score of years and on which the Trust Company relied was that the City Council held out its solicitor as having authority to settle suits against the city, and again and again appropriated funds for the payment of these consent verdicts. Any individual so holding out for twenty-four years his attorney as possessed of the power to settle claims against him would clearly be estopped to deny that agency to one who had

acted to his detriment on the 'fact' of agency thus represented. . . ."

In the case at bar, the borough of Wind Gap held Templeton out as its chief of police for five years. During that time the borough armed Templeton with the badge of authority and the weapons of command. For five years Templeton patrolled the streets of Wind Gap as the living symbol of government. For five years Templeton made arrests in the name of Wind Gap and during those five years people were sent to prison as the result of arrests made and testimony presented by him in court. *It is simply grotesque now to say that Templeton was never a policeman.* May evildoers who were jailed because of Templeton's vigilance during that period now protest that their incarceration was illegal?

As grotesque as is this contemplation, it is even more absurd for the Borough of Wind Gap to claim, in effect, that Templeton was an imposter, donning the blue uniform with brass buttons in self-indulging masquerade. As a matter of fact, Templeton's position as chief of police of Wind Gap was so assuredly accepted by the municipal authorities that when they took steps to oust him they followed the procedure outlined in the Police Tenure Act of 1951 which of course can only be invoked in the cases of legally accepted police.

In the case of *Com. ex rel. Storb v. Schroll,* heretofore referred to (398 Pa. 354), we considered the situation where the Commonwealth was seeking to oust Robert M. Schroll from the office of school director in Earl Township, Lancaster County, because he had not been a resident of the township for one year as required by the Public School Code. In the lower Court, Schroll resisted the action on the basis that the qua warranto proceedings were barred by laches. This Court remanded the case to the trial Court so that Schroll would have an opportunity to show how and in what

manner he had been prejudiced by the Commonwealth's delay in questioning the legality of his appointment. And in doing so, this Court cited with approval from *Grote Trust*, 390 Pa. 261 (also a recent case, 1957) wherein Justice BELL, speaking for the Court, said: "Laches arises when a defendant's position or rights are so prejudiced by length of time and inexcusable delay, plus attendant facts and circumstances, that it would be an injustice to permit presently the assertion of a claim against him."

As I read the record in this case, the dismissal of Templeton is nothing less than an act of gross injustice. For five years he rendered excellent services in good faith. A former president of the borough council testified: "As far as his performance of duties as a police officer . . . (there was no criticism) ; his work was satisfactory." During his whole incumbency Templeton performed his police duties on the representation which was implicit in the Borough's conduct that he was its duly appointed chief of police. The taxpayers accepted those valuable services. To now rob Templeton of the rights attached to the office which he held with the borough's and the taxpayers' acquiescence is, to say the least, an act of ingratitude. One does not always expect to come across the flower of appreciation blooming in the fields of legal controversy, but one can invariably be certain of finding the pernicious fruit of ingratitude dangling from the upas tree of injustice. And if law is intended to right injustice, it is a melancholy paradox in this case that a municipality, which is the very symbolization of law, government and civilization, should be the willing instrument of ingratitude and injustice.

I would reverse the decision of the court below, because the Borough Code does not say what the Majority claims for it. I would reverse because in reading the

code, we must be guided by the Statutory Construction Act of 1937 which says that in interpreting the intention of the Legislature in the enactment of a law, the Courts are to be guided by the presumption: "That the Legislature does not intend a result that is absurd, impossible of execution or unreasonable."

On this subject, Judge ARNOLD (later Justice ARNOLD) said in the case of *Duddy v. Conshohocken Printing Company,* 163 Pa. Superior Ct. 150, that: "Where a statute is fairly susceptible of two different constructions the court may properly consider the injustice, unreasonableness and inconvenience that would follow one of the constructions contended for."

The construction contended for and adopted by the Majority of this Court produces a result that is palpably unjust. And what makes the Court's decision particularly distressing is that there is no reason impelling it. Giving a de jure realism to a de facto status would visit no harm upon the municipality. But denying a de jure realism to a de facto existence subjects Templeton to irreparable harm. If the Templeton appointment was illegal in its inception, the municipality had the bounden duty to inform him of it. And, if disposed to dismiss him, it could have and should have done so immediately. And had it done so, Templeton could have obtained employment in some other position where by now he would have earned five years of seniority, retirement benefits, prestige and all the other privileges which, by the action of this Court, have now been dumped into the dustbin of futility, irreparability, and oblivion.

Disassociating myself from this melancholy result, I dissent.