## Masemer v. Borough of McSherrystown

*Brown, Swope & McPhail,* for appellant.

*Ronald J. Hagarman,* for respondent.

SHEELY, P. J., September 14, 1964.—This is an appeal by Mannard Masemer, Chief of Police of the Borough of McSherrytown, from the action of the borough council suspending him from his duties as chief of police, without pay, and demoting him from chief of police to patrolman at a reduced salary.

From the record it is apparent that all parties concerned were at times confused as to the statutory authority under which they were proceeding and as to the proper procedure. Therefore, before considering the various questions raised by the appeal, it will be well to consider the pertinent statutory provisions.

Under the provisions of the Borough Code of May 4, 1927, P. L. 519, art. XI, sec. 1125, as amended, 53 PS §46125, "Borough Councils may . . . appoint and remove, or suspend, or reduce in rank, one or more suitable persons . . . as borough policemen. . . . The borough council may designate one of said policemen as chief of police. The burgess of the borough (now mayor) shall have full charge and control of the chief of police and the police force, and he shall direct the time during which, the place where, and the manner in which, the chief of police and the police force shall perform their duties." Section 1127, 53 PS §46127, provides that "the burgess may, for cause and without pay, suspend any policeman until the succeeding regular meeting of the council, at which time or thereafter the council may, subject to the civil service provisions of this act, if they be in effect at the time, suspend, discharge, reduce in rank, or reinstate such policeman."

Under the amendment to the Borough Code adopted July 10, 1947, P. L. 1621, 53 §46165, there was added to the code the provisions relating to civil service for police and firemen. These provisions were derived from the Act of June 5, 1941, P. L. 84, 53 PS §53251, et seq., which was repealed in part. Under section 39 of the amendment it is provided that this subdivision shall not apply to any borough police force of less than three members. It is there provided that: "No person shall hereafter be suspended, removed or reduced in rank as a paid employee in any police force . . . of any borough, except in accordance with the provisions of this subdivision."

The situation with relation to the various statutes is well stated in George v. Moore, 394 Pa. 419, 420 (1959):

"Prior to 1941 police employed by all boroughs had no civil service or job tenure rights and were subject to peremptory removal by borough council. The Police

Civil Service Act (Act of June 5, 1941, P. L. 84, 53, PS §53251) changed this for boroughs employing three or more policemen. By that Act police employed by boroughs were granted job tenure rights which prohibited their dismissal, except for causes stated in the statute and in compliance with the procedures outlined therein. All the provisions of the Act of 1941 have been re-enacted as a part of The Borough Code (Act of July 10, 1947, P. L. 1621, 53 PS §§46165-46190). The re-enactment still applied only to boroughs having police forces of three or more members. In 1951 the legislature passed a Police Tenure Act (Act of June 15, 1951, P. L. 586, 53 PS §§811-815) which extended dismissal procedures of the Act of 1941 to police forces of less than three members." That case held that the Act of 1951 was not repealed by the 1957 Amendment to the Borough Code. See also McCandless Township v. Wylie, 375 Pa. 378, 382 (1953).

The Act of 1951 makes no provision for details of procedure, but it has been held that the procedure outlined in the Act of 1941 should be followed, and that on appeal the court may hear additional testimony, if any, and find for itself the facts necessary to a just determination of the controversy. The court shall make its own order concerning the suspension, discharge, or reinstatement of the officer. The evidence to support the charge must be "clear and convincing": Vega Appeal, 383 Pa. 44 (1955). See also Stoerzinger Appeal, 12 Cumberland 5 (1961).

Under the Act of 1951 a regular full time police officer may only be suspended or removed for causes stated in the act, and the term "regular full time officer" refers to the nature of the job held and the character of the work performed: Deskins v. West Brownsville Borough, 388 Pa. 547 (1957). A police officer employed on a part-time basis but who is on call at any and all times for normal police duties is "a regular

full time police officer" within the meaning of the Police Tenure Act of 1951: Petras v. Union Township, 28 D. & C. 2d 687, affirmed per curiam, 409 Pa. 416 (1963).

While the Act of 1941 and the Amendment of 1947 to the Borough Code, 53 PS §6165, provides that no police officer should be "suspended, removed, or reduced in rank" except as therein provided, the words "or reduced in rank" were removed from the Act of 1951 in the legislature with the result that the Act of 1951 does not apply to demotions or reductions in rank: Rossiter v. Whitpain Township, 404 Pa. 201 (1961).

Where the police department consists of less than three members dismissal or suspension can only be brought about legally by the filing of charges statutorily specified and enumerated in section 2 of the Act of 1951. If a public hearing is requested, such is the legal right of the accused and, in order to impose upon him the severe penalty of suspension or dismissal, proof of the charges to sustain that action must be clear and convincing: Templeton Appeal, 399 Pa. 10, 12 (1960).

The Police Civil Service Act of 1941 does not deprive council of the power to appoint and remove, nor the burgess of the power to suspend, but merely prescribes and limits the conditions under which these powers may be exercised: Bragdon v. Ries, 346 Pa. 10, 12 (1942). The burgess has the power to suspend an officer pending action by the borough council at its next meeting: In re: Suspension of Charles E. Laux, 23 Northumb. 137, 145 (1951). While these cases related to the Police Civil Service Act, the same result would apply under the Police Tenure Act, section 1185 of the former, 53 PS §46185, and section 4 of the latter, 53 PS §814, containing the same provisions as to suspensions pending determination of the charges against the officer.

From this review of the relevant statutes and the authorities decided thereunder the following rules and procedures are evolved. In a borough having less than three policemen the burgess, or mayor, may suspend a police officer for one of the causes set forth in the Act of 1951, but only until the next regular meeting of the borough council. A written statement of the charges against the officer must be furnished to him within five days after the same are filed, and he may file written answers thereto within another five days. At the regular meeting of the borough council after a suspension by the mayor the borough council may hear the charges against the officer if sufficient time has elapsed for the filing of the written charges and an answer thereto. If sufficient time has not elapsed borough council may either revoke the suspension and restore the officer to his position, or continue the suspension to a time certain to provide time for a hearing. In any event, the hearing must be held within 10 days after the filing of charges and written answers thereto. If requested by the officer the hearing must be a public hearing. The hearing may be continued for cause or at the request of the accused. At the hearing the borough council, appointing authority, must uphold the charges by evidence which is clear and convincing. If the council fails to uphold the charges by evidence which is clear and convincing the officer must be reinstated with full pay for the period during which he was suspended. If the charges are upheld the officer may be removed from office, reduced in rank, or suspended for a period of not to exceed one year to begin as of the date of his initial suspension. The borough council may reduce an officer in rank without the necessity of the filing of charges or a hearing.

With these authorities in mind we consider the facts of the present case. Mannard Masemer was the Chief of Police in McSherrystown Borough since February,

1945, and also acted as borough supervisior or maintenance man, at a salary of $82 per week. His duties included regular police work and repair and consruction of streets, snow removal, etc. There was no set schedule for the performance of his many duties, but he was at all times subject to call for police duties and was, therefore, a regular full time police officer: Petras v. Union Township, 409 Pa. 416 (1963); Deskins v. West Brownsville Borough, 388 Pa. 547 (1957).

The borough also employed four other police officers on a part-time basis, two of whom were assigned to duty at Danceland and two of whom took turns, every other weekend, on patrol. They all had other regular employment and were not on call at any and all times for police duty. The borough police force, therefore, consisted of less than three men and the Police Tenure Act of 1951 applies.

During, or at the conclusion of the regular monthly meeting of the borough council on March 9, 1964, Mayor deCheubell suspended Mr. Masemer from duty as chief of police "until the next regular meeting of borough council or until such time as borough council may want to call a special meeting to consider." At that time council set March 23, 1964, at 8 as the time to "air the charges" filed against Chief Masemer. Since March 9th was the "regular monthly meeting" of borough council we may assume that the next regular monthly meeting would have been held in April and that March 23rd was fixed as a special meeting to "air the charges" filed against Masemer.

At the meeting called for March 23rd, Mr. Masemer properly refused to appear because no written charges had been filed. His attorney did appear and it was agreed that the Mayor would immediately file charges to be served upon Masemer and that the charges would be reviewed at a *public hearing* on April 10, 1964, at 8 p.m. Written charges were filed on March 24th, and they were served on Masemer on March 25th.

At this point counsel for Mr. Masemer and the borough solicitor became embroiled in a controversy over procedure and which statute was applicable. By letter dated March 26th, counsel for Masemer took the position that the Police Civil Service Act of 1941 was applicable since the borough had more than three policemen, and that the Mayor had no authority to suspend either under that act or under the borough code. Therefore, he contended that Masemer was entitled to a hearing before the Civil Service Commission, and demanded a public hearing. Contending that the hearing fixed for April 10th was illegal he would advise Masemer not to appear. This was followed by another letter on March 30th stating that if the borough council held a hearing with respect to charges against Masemer on this Friday, which would be April 3rd, or any other time, it was Masemer's desire that the hearing would be public. He reserved the right to dispute the jurisdiction of the borough council.

On April 1st, the borough solicitor wrote counsel for Masemer that after conferring with borough council concerning his letters of March 26th and March 30th, it was their decision to continue with a closed meeting on April 3, 1964, at 7:30 p.m.

On April 2, counsel for Masemer again wrote the borough solicitor that he was in receipt of the solicitor's letter of March 30th, was it the letter of April 1st, stating that borough council intended to hold a *closed* meeting on April 3, 1964. He referred to his letter of March 30th, requesting a public hearing "as provided in Section 4 of the Act of 1951, P. L. 586," and again demanded a public hearing on the charges against Masemer. This letter was hand-delivered and, on the same date, April 2, the borough solicitor again stated that borough council would review the charges against Masemer on Friday evening, April 3, 1964, at 7:30 p.m., and that the meeting would be a *closed* meet-

ing. To emphasize the point he said: "I repeat, this meeting will be a closed meeting at which you and your client and any and all witnesses that he may have may appear in his behalf." He and borough council based this decision on the fact that counsel for Masemer continued to dispute the jurisdiction of borough council and they "cannot conceive how you can deny our right to even hear the matter while at the same time demand a hearing." They therefore had decided "to proceed in accordance with the law and have a closed meeting pursuant to Section 4 of the Act of 1959, P. L. 586." [Apparently intended to mean "Act of 1951, P. L. 586."] He further stated that if there was any conflict created in the matter it was counsel for Masemer's "own doing and you and or your client will have to assert your right of appeal and explain your attitude to the Court." The borough council's position was restated at the beginning of the hearing on April 3, 1964.

It developed at the hearing that the borough had only one full time police officer, and therefore counsel for Masemer was incorrect in his contention that the Police Civil Service Act of 1941 contained in the Borough Code of 1927, was applicable. But this fact could not be determined until the status of the other four police officers of the borough was developed at the hearing, and counsel was certainly within his rights in questioning the jurisdiction of Borough Council. Since the borough had only one regular full time police officer the procedure outlined in the Act of 1951 and the borough code was applicable.

We are not clear on how the hearing date was advanced from the agreed date of April 10th to April 3rd. The latter date would seem to be premature unless it was the next regular meeting of borough council after March 9th, the date of the suspension by the Mayor, since the suspension was until the next regular

meeting of council as provided by statute. In any event, Masemer did appear with counsel for the hearing on that date and any irregularity on that score was waived.

It is perfectly clear, however, that Masemer repeatedly demanded a public hearing and that borough council refused to grant his request. Section 4 of the Act of 1951, specifically provides that "the appointing authority shall grant him a public hearing." The fact that he was denying the jurisdiction of borough council and the Mayor to suspend him was no justification to refuse him the right to a public hearing which was accorded him by the very statute which gave borough council the right to suspend him. It seems that in this regard borough council acted arbitrarily.

At the hearing itself it seems that there was no one acting as a presiding officer. There were many objections to the admissibility of testimony by counsel for Masemer, some of which were well founded and some not so. Much of the testimony was purely hearsay. In each instance the borough solicitor instructed the reporter to note the objection and then proceeded with the testimony objected to without a ruling as to its admissibility. We may assume, therefore, that in reaching its conclusions borough council took into consideration all the testimony offered, whether objected to or not, and whether admissible or not. In fact, at oral argument the borough solicitor made the statement that in a small community people generally know what is going on and that it was likely that some members of council had personal knowledge of the activities of the police chief.

Under the Police Tenure Act the purpose of the hearing is to hear testimony to determine whether the charges against the officer are upheld, and that evidence must be "clear and convincing": Vega Appeal, 383 Pa. 44 (1955). If the hearing authorities act on

hearsay and other inadmissible testimony and on their own personal knowledge, without testimony, the whole purpose of the hearing is defeated. The case is before the court de novo, however, and the court must make its own findings and conclusions from the record before the borough council, discarding improperly admitted testimony.

After the hearing borough council suspended Masemer for a period of 30 days from April 4, 1964, through May 3, 1964, without pay, and notified him that he would be reinstated as a patrolman after the expiration of the suspension period, and that he could appeal to the court of common pleas. He was later advised that his salary would be $3,120 a year, plus $600 car allowance, plus $100 for clothing allotment, a reduction from $4,264 per year. We are not here concerned with the demotion or the reduction in pay since the right of borough council to demote or reduce in rank and pay is governed by the borough code and is not limited by the Act of 1951: Rossiter v. Whitpain Township, 404 Pa. 201 (1961), supra.

Seven charges were filed against the chief of police, although one of them was withdrawn at the hearing which lasted from 7:30 p.m. until 12:45 a.m., and covered 140 pages of testimony. We will consider the various charges separately.

### James Groft Case

According to Donald Krepps, justice of the peace and also a member of borough council, James Groft was brought to his office on October 22, 1961, by an officer. At that time he admitted that during the previous week he had been in McSherrystown and that he was drunk and driving an automobile; that he passed out and ran into a tree; that he was picked up by Chief Masemer and questioned and the chief said he would have to go to Juvenile Court. However, in a few days,

his mother saw the chief and he said he would give the boy a break. After hearing the boy Mr. Krepps sent for Chief Masemer and had the boy repeat the story while he typed it. When he had concluded the statement he tried to hand it to the chief telling him he would have to turn it over to York County Juvenile authorities, whereupon the chief said: "Well, I got to leave" and walked out.

Mr. Masemer denies the story and testified that he was called to an accident that night, but when he arrived Groft had been taken to the hospital. Later Groft was brought to the engine house and the officer who had him in custody said he had been drinking. The chief checked him and concluded that he was not under the influence and had not had much to drink. No other testimony was offered.

What was said by Groft to Mr. Krepps outside the hearing of Mr. Masemer was purely hearsay and should have been excluded. What was said in the presence and hearing of Masemer was competent if Masemer heard it and failed to deny it. It is an admitted fact, however, that Mr. Masemer is deaf and he does not at times use a hearing aid. His statement that he had to leave, without more, would indicate that he did not comprehend the statement made by Groft to Krepps.

In any event, there were other witnesses such as Groft, his mother, and the officer who took Groft to the hospital who could have testified to the actual facts. We are not satisfied that this charge has been upheld by clear and convincing evidence. We also note that this incident occurred nearly three years ago.

### Sisters of Mercy Case

This matter concerned a series of events which occurred on or about June 16, 1962, involving a young girl from Hanover, who, with others, were harassing the Sisters of Mercy at their convent in McSherrys-

town and while they were on the street. All the facts were testified to by Mr. Krepps as the result of reports made to him and was hearsay. The first incident occurred on the Baltimore Pike south of Hanover, in York County, when the girl attempted to run the Sisters, who were in their automobile, off the road. The Sisters reported the matter to Mr. Masemer who turned it over to the State police since it had occurred out of his jurisdiction. The following week the Sisters called Mr. Krepps and complained that the girls cursed them on the street, threw stones and refuse on their porch and in their yard; stoned their automobile and smeared pizza pie on it in Hanover. He suggested that they notify the police and she said they had notified Mr. Masemer and no action was taken.

Shortly thereafter, the girl in question was involved in a fight with another girl in front of Fee's Cut Rate Store in McSherrystown, and Chief Masemer was called. He chased the girl out of town and followed her to make sure she went home. It was Mr. Krepp's opinion that in view of the previous reports about the girl a juvenile petition should have been filed at that time.

After the Sisters called Mr. Krepps and told him these things Krepps called Masemer in and talked to him about it. Masemer said he had the reports and had also received an anonymous letter concerning them, but that the various acts had not occurred in his presence and he was checking on them.

On June 25, 1962, about 11:15 p.m. the girls were again harassing the Nuns at the convent and the Nuns called both Mr. Krepps and Mr. Masemer. Masemer picked up Krepps in his car and the two went to the convent and apprehended the girls. Mr. Krepps insisted that the girls could not be released until their parents came for them and that Masemer had to file a juvenile petition. Mr. Krepps then typed the petition and a statement of facts, which Masemer signed, and the

girls were brought into Juvenile Court in Adams County. At this point Mr. Krepps was asked what was Masemer's attitude about the case and he replied that he did not know because he was insisting he had to send them to Juvenile Court and there was no alternative. It is noted that the orders were given by Mr. Krepps and not by the Mayor. The girls were put on probation on July 5, 1962.

Beginning about July 10, 1962, Mr. Krepps and the Sisters began receiving malicious telephone calls, and the Sisters called Mr. Krepps for help. He had them keep a record of the calls. One evening he was at the convent when one of the calls was received and he made notes of the language used. He then arranged with the telephone company to make a check of the calls and they traced them to the home of the girl in question. Mr. Krepps then told Masemer that the girls were going to have to go back to Juvenile Court. He also told Officer Smith who was on traffic duty on Sunday morning to be on the lookout for the girl. That morning the girls committed certain acts in front of the church and at the convent in Officer Smith's presence. Officer Smith and Mr. Krepps had the girls brought back to Juvenile Court and the one girl was sent to a reform school while two others were turned over to the York County Probation Department.

The situation described was outrageous conduct on the part of the girls, but the question before the court now is whether Mr. Masemer "failed to effectively cope with the juvenile problem concerning the Sisters of Mercy" as charged by the Mayor. There are a number of problems involved here. The first incident concerning the attempt to run the Sisters off the road occurred in York County, outside of Mr. Masemer's jurisdiction, and he very properly referred it to the State police. When they found that the girl's father insisted that the girl did not have the car at that time

they dropped the case and even the Sisters were satisfied because they thought that since the parents knew of the difficulty it would cease. Mr. Krepps acknowledged that this was handled satisfactorily.

The stoning of the automobile and the smearing of pizza pie was likewise in Hanover, outside the jurisdiction of McSherrystown police. As to the harassment of the Sisters, when Mr. Krepps talked to Masemer about it he said he did not do anything at the time because nothing happened in his presence and he could not prove the acts. In this he was correct as the only apparent witnesses were the Sisters who will not voluntarily appear and testify, and the court would not, in a matter of this type, compel them to appear. The only thing he could do was to keep a check on the convent in the hope that he could catch the girls in the act. When the call was received on June 25th he did respond and, together with Mr. Krepps, did apprehend the girls and bring them into Juvenile Court.

Thereafter, it appears that the Sisters dealt directly with Mr. Krepps concerning the telephone calls and that he did not turn the matter over to Mr. Masemer. Instead, he took matters into his own hands and did, effectively, locate the source of the calls. Mr. Masemer cannot be blamed for not acting on something that was not reported to him.

The finale of the case was that Mr. Krepps told Officer Smith to be on the lookout for the girls and that he did catch them in the acts before the church and at the convent on Sunday morning. In this connection it is interesting to note that Officer Smith testified that Chief Masemer also told him to be on the lookout for the girls.

There is some indication in the record that the Juvenile Court acted upon the hearsay testimony of Mr. Krepps and on the result of an investigation made by the Probation Officer who interviewed the Sisters. This

is only partially correct. The girls were before the court twice; when Chief Masemer brought them in after he and Mr. Krepps apprehended them in the hedge of the convent, and when Officer Smith and Mr. Krepps brought them in after Officer Smith caught them on Sunday morning. In both instances their delinquency was established by direct testimony before the other matters were considered, and the girls then admitted the other matters. They were not adjudged delinquent on the basis of the hearsay testimony. This charge must be dismissed.

### Miller and Long Case

The third charge against Chief Masemer was that he failed to file charges against Robert Miller and Mark Long "after said case was assigned to him on information received, although said violation was flagrant and numerous complaints by the residents had been voiced."

Mr. Krepps was also the principal witness on this charge. He testified that on August 27, 1962, he was awakened at 1:15 a.m. by the sound of cars racing around the block making their tires squeal, and it sounded as though one of them had a defective muffler. Mr. Krepps called Chief Masemer who responded. Later Chief Masemer told him he had checked the Robert Miller place because one time when he passed the house the car was not there and the next time he passed it was there and the engine was warm. He went into the house and talked to Miller "and he thought maybe he was the one involved in it." No action was taken at that time and the next day Mr. Krepps recevied numerous complaints from the neighbors but none of them could give him any information as to who the parties were.

Mr. Krepps let the matter go for a few days and "found out nothing was done about it," so he passed the information to another officer who, in turn, made

an investigation and found out it was Robert Miller and Mark Long. Information charging the two boys with reckless driving was laid before Krepps as justice of the peace and the boys came in and paid their fines.

Mr. Krepps admitted on cross-examination that he did not know whether Chief Masemer was still investigating the matter when the other officer arrested the boys, and he never asked him because he "assumed nothing would be done since he talked to the Miller boy." He also "assumed that since Mr. Masemer frequented the place up there that probably no charge would be filed if it was him—he is a very good friend with the Millers."

Francis Warner testified that he was the officer who investigated the matter and arrested the boys. He told whom he interviewed and apparently he did not have much trouble getting the information. He also said that the chief did not interefere with him in any way or tell him not to arrest the defendants.

This testimony falls short of proving that Chief Masemer failed to perform his duty unless we accept Mr. Krepp's assumptions that he would not make the arrest because of friendship with the Miller family. There is nothing to show what the Miller boy told the chief when he interviewed him, and we know from experience that it is not customary for one who has violated the law to admit it immediately on being questioned unless he was caught in the act. Mr. Krepps, who gave the chief the information about the violation, was not able to identify the culprits, and until the chief had witnesses who could identify them or their vehicles he could no nothing. This charge must be dismissed.

The fourth charge alleges that Chief Masemer has, for the past several months, been inefficient, neglectful, disobedient, and has evidenced conduct unbecom-

ing an officer. This is followed by seven specifications which will be considered separately.

## Children's Safety Program

The testimony concerning these charges was given by Mayor deCheubell who testified that on January 8, 1964, he informed Chief Masemer that he would like him to assist with the Adult Safety Program under which, apparently, various adults in the borough volunteered to serve as guards at street intersections as children were on their way to and from school, and assigned him to duty at 4th and North Streets. The chief objected vigorously, contending that it was not his line of duty, and threatened to resign rather than take the assignment. After some discussion the chief accepted the assignment and was on duty at least three days. On January 23rd, it was brought to the Mayor's attention that the chief was not on duty and the following day he asked him about it. The chief told him, according to the Mayor, that he had gone with a Mr. Miller to look after a horse at Mt. Rock. The Mayor reassigned him and he again threatened to quit. However, from that date on the Mayor testified that he was on duty, except for emergencies, until the suspension.

Burnell Wagner, the borough secretary, testified that Chief Masemer complained about the School Safety Program when Mayor Sneeringer first started it and that in January, after a talk with Mayor deCheubell, he again complained and said that he did not feel that school work was part of his duties. After a talk with Mr. Wagner he agreed that he reacted too quickly and should not have made the statements he did. He also complained after the Mayor talked to him later about the assignment, but they got the matter straightened out.

As to the School Patrol on January 24th, the chief testified that he was on duty in the morning, but dur-

ing the rest of the day he was having trouble about a dog concerning which he had a complaint. He did not recall the horse incident, but stated that his big objection to the Safety Patrol assignment was that there were many times that he could not be on his post due to his responsibilities for borough street work, etc., and his other police duties. He emphatically denied that he was ever in a store when he should have been on duty.

Considering that the School Patrol would require his presence, preferably in uniform 4 times a day for 5 days a week, for 15 minutes to a half hour, and that he had full responsibility for street work as well as being the only police officer on duty during the week, it is understandable why he would object to this additional responsibility. It is apparent that he expressed himself more forcibly than was necessary, but the fact remains that after the first difficulties he was on duty regularly until he was suspended. In fact, Mr. Wagner testified that he was a good police officer for 20 years. This charge cannot be sustained.

The charges of refusal to prosecute criminal matters and failure to assist other officers, apparently were not pressed.

### Neglect to Have Speedometer Checked

The practice in McSherrystown seems to have been for the officers to have their speedometers checked at H. & H. Machine Shop in Gettysburg, and for the Machine Shop to bill the borough for this service, sometimes having the officer sign the invoice and sometimes sending the invoices with no signature or indication as to whose vehicle was checked. There was no invoice for a check of Chief Masemer's speedometer for a period of two years.

According to Chief Masemer he did have his speedometer checked from time to time and he frequently paid the $1 fee himself. He admitted that he had not had it

checked for four months because he did not get around to it, but stated that he never lost a case because of not having the speedometer checked. This would seem to indicate that he made no speeding arrest while his speedometer was not checked, or that the parties arrested did not contest their cases. In any event, there is no evidence of any regulation of the borough or of the Mayor requiring officers to have their speedometers checked at regular intervals and, while an officer with the experience of Chief Masemer should take care of this detail without a regulation, we do not consider this neglect a cause for suspension.

*Arresting Officer Under His Command For Speeding*

Mayor deCheubell testified that according to Chief Masemer's records he stopped Officer Tom Carbaugh, who was in uniform, on February 12, 1964, speeding at 45 miles per hour in the borough. On cross examination he admitted that Carbaugh had not been arrested but that the chief had merely given him a warning. This was confirmed by Officer Carbaugh who added that Masemer had been asked to resign as Chief of Police of Conewago Township and that Masemer was out to get him as he was later elected in his place.

There is an implication here that Chief Masemer was acting through malice, yet there was no testimony that Carbaugh was not exceeding the speed limit. Whether Masemer acted through malice or not he can hardly be condemned for warning a speeder whether the speeder was another officer or not.

*Association With Known Store Keepers When He*
*Should Have Been On Safety Patrol*

The matter of Safety Patrol has herein before been discussed. Under this heading, over the vigorous objection of counsel for Masemer, the borough solicitor introduced testimony tending to show that Chief Masemer engaged in placing bets on horse races. This is

perhaps the most serious charge made against him and might, in itself, be grounds for suspension if properly proved. However, we agree with counsel for Masemer that the testimony was entirely improper since there was no intimation in the charges filed that such testimony would be offered. The suspension must stand or fall on the charges filed and we therefore cannot consider this evidence.

The charges made under paragraphs 5 and 6 were included in the testimony relating to the Safety Patrol.

### Failing To Assist One Of His Officers With The Arrest Of A Female

Mayor deCheubell testified that on February 24, 1964, Officer Smith had a warrant for the arrest of a woman and the Mayor said the chief should go along with him to serve it. The chief called the Mayor and asked: "How come he had to do constable work?" Instead of going along himself he made arrangements with the Sheriff and the woman came in and paid her fine. Again on February 26, 1964, Officer Warner had a warrant for the arrest of a woman and the chief was asked to go along. He said that he would quit his job, but after the Mayor explained that it was his duty to go he did go along. As the Mayor expressed it, he was disturbed because of the rebellion every time there was an assignment, which is completely understandable. However, in each instance, after the chief's duties were explained to him he did comply. This charge cannot be sustained.

There is no testimony offered as to charge No. 9 relating to conduct at a special police committee meeting.

### Joe Long Case

The charge here is that Chief Masemer on or about March 1, 1964, did fail to investigate the alleged delinquency of Joe Long. This situation seems to be the

one that triggered the filing of charges against Chief Masemer. The witnesses to it were Mr. Krepps, Mr. and Mrs. McWilliams, the parents of Joe Long, Officer Carbaugh, and Chief Masemer. To get the matter into proper prespective it is necessary to consider the facts in the order in which they occurred. Starting with the results and working backwards always gives an improper perspective.

Mr. McWilliams, the stepfather of Joe Long, went to Chief Masemer's home one evening and told him he was afraid the boy was becoming delinquent, and he did not want him up at Littles on account of getting into trouble because he knew that they were getting beer there. He asked for Masemer's help and Masemer said he would try to find the boy. He did not consider the conversation as a complaint against anyone but rather a request by a father for a favor in connection with his son. About two weeks later Mr. McWilliams returned with his wife and they were told by Masemer that he had not done anything yet; that he was checking around. Mrs. McWilliams testified that at that time the boy had been gone over night and that they asked Masemer if he had seen him with the Little boy. He said he had not; that he had seen him with a girl. They asked if he thought the boy might be up at the Little place then and he suggested that they go up and check; that if he were along Mrs. Little would not say anything. Mr. Masemer confirmed this and said he told them that if they had no luck they were to come back and he would do something. According to Mrs. McWilliams they did not ask him to go along but merely asked him to keep a lookout for Joe. She also said that they knew Joe was drinking and at Littles, but they did *not* mention that to Masemer.

As the matter then stood, there had been nothing more than a request by the parents to the chief to keep a lookout for their boy and a statement of Mr. McWil-

liams that he knew they were getting beer at Littles whose son was a friend of Joe Long. According to Chief Masemer, he did not consider this to be a complaint which required investigation or entry in the complaint book at police headquarters, but he considered it a request for a favor by a parent to keep a lookout for his boy.

On March 1, 1964, Officer Carbaugh saw the Long boy leave the Midway dance and followed him. At that time another boy who was taken into custody said he had gotten drinks from Long, and a bottle of liquor was found in the snow. On March 7th, Long's parents called Carbaugh and told him the boy was not home the night before and he was to pick him up. He called Officer Smith to pick him up and after some questioning the boy told about the drinking and where he had gotten it. He was then taken to the office of Justice of the Peace Krepps where he made a statement to the effect that 35 to 40 children had gotten beer from Mrs. Catherine Little. On the basis of this information warrants were issued for Mrs. Little and she was arrested. At the time of the hearings in this matter her case had not been disposed of. At that time Mr. Krepps told the Long boy's parents that they should have notified the McSherrystown police about the matter. Mr. McWilliams said he had told Masemer three weeks ago that his son was delinquent.

At the borough council meeting on March 9th, according to Mr. Krepps, Chief Masemer was questioned about the matter. At first he denied having seen the McWilliams, and then admitted seeing them but said he did nothing and did not tell other officers or enter the matter in the complaint book. Krepps then said there was a possibility of four charges being filed: contributing to the delinquency of minors, corrupting morals of minors, furnishing intoxicating beverages to minors, and selling beer without a license. Mr. Masemer then

said that at the time he did not think it was that important.

On these facts the chief was charged with (a) failing to note the complaint in the complaint book, and (b) failing to assign the case to another officer, and (c) failing to investigate the case himself, and (d) attempting to state that the delinquency complaint was never made.

Going back to the conversations between Mr. and Mrs. McWilliams and Mr. Masemer, it is clear that they did not make a complaint of any law violations in the borough, and that they had no evidence of any such violations. They were concerned only about their son getting into trouble and they asked Masemer to keep a lookout for him. While Mr. McWilliams mentioned the fact that the boy and the Little boy had some beer at Littles, he did not indicate that it had been purchased or that Mrs. Little had furnished it. When Mr. and Mrs. McWilliams together saw Mr. Masemer, Mrs. McWilliams testified nothing was said about boys drinking at Littles.

Many people ask police officers to keep a lookout for their children in order to avoid trouble. Such a request as was made here did not warrant making a Federal case out of it. As Mr. Masemer said at council meeting, at the time he did not think it was that important. Certainly he did not have such information as would have justified the arrest of anyone or the securing of a search warrant for the Little property. The case broke after another boy told Officer Carbaugh he had secured intoxicants from the Long boy.

He is also charged with failing to recognize that the complaint involved several criminal charges, as outlined by Justice Krepps, and indicated that he did not feel that the matter was important. As we have indicated, there is nothing in the conversations with the McWilliams that indicated any criminal violations

of which he should have taken cognizance and he did not say he did not feel the matter was important. What he said was that *at the time* [Mr. McWilliams talked to him] he did not think the matter was *that* important, clearly meaning that he did not think it involved criminal charges. This charge is without foundation.

A review of the charges, three of which are at least two years old, brings us to the conclusion that most of them are not established by clear and convincing evidence, and the minor difficulties which are established are not sufficient to warrant suspension of the officer. Chief Masemer has been the only regular full time police officer in McSherrystown for nearly 20 years and the borough secretary testified that he has been a good police officer. He has also had the full responsibility for maintenance work on the streets, etc. Apparently over the years he has had to work out his own time schedule and it is only recently that the Mayor has assumed his proper responsibility for directing the police work. The chief has not always agreed with new programs and has had difficulty adjusting to new policies which interfered with his former programs. However, when his duties were explained to him he did accept his responsibilities. He is also quite deaf and the testimony indicates that he did not always understand the directives. All of this can be readily corrected by the adoption of a simple manual defining duties and procedures.

As we have indicated before, the only matter before us is the validity of the suspension order. The order reducing him in rank and in pay is within the discretion of borough council and the Act of 1951 affords him no protection in that regard.

And now, September 14, 1964, the appeal of Mannard Masemer from the action of the borough council in suspending him from his duties as chief of police without pay is sustained and it is directed that the

borough pay him the salary which was not paid during the period of such suspension. An exception to this order is noted on behalf of the borough.