446 A.2d 226

**Gerald JACKSON, et al.**

v.

**Edward J. HENDRICK, et al.**

**Application of Edward G. RENDELL, District Attorney of Philadelphia, Petitioner.**

Supreme Court of Pennsylvania.

Argued Jan. 19, 1982.

Decided May 25, 1982.

Reargument Denied July 12, 1982.

Eric B. Henson, Deputy Dist. Atty., Kenneth S. Gallant, Asst. Dist. Atty., for petitioner.

John A. Beck, David Rudovsky, Donald S. Bronstein, Philadelphia, for plaintiffs.

John M. Myers, Asst. City Sol., Philadelphia, for defendants.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY, McDERMOTT and HUTCHINSON, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

Petitioner Edward G. Rendell, District Attorney of Philadelphia, seeks extraordinary relief from a decree of the Court of Common Pleas of Philadelphia denying him leave to intervene in the matter of *Jackson v. Hendrick*, No. 2437 February Term, 1971, a decade-old controversy over the conditions of confinement at Philadelphia's prisons. We are satisfied that the court of common pleas did not abuse its discretion in holding that petitioner was dilatory in applying for intervention. Hence we deny the petition for extraordinary relief.*

* This case was reassigned to this writer on April 26, 1982.

I

Over ten years ago, in its initial adjudication declaring conditions of confinement at Philadelphia prisons unconstitutional, the court of common pleas observed:

"There can be no doubt that many of the difficulties in the prisons would be alleviated were the prisons not so overcrowded. The shortage of guards would become less critical; as the cells would not be so crowded, it might be possible by classification procedures to segregate dangerous prisoners, and to keep detentioners and sentenced prisoners apart; the doctors could spend more time on physical examinations, and could see more prisoners on sick call; the social workers could provide more counseling."

Opinion of April 7, 1972.[1] Since then the court of common pleas has entered three remedial decrees designed to alleviate overcrowding, including its most recent decree of March 17, 1981. Like the previous decrees, the decree of March 17, 1981, established a mechanism for the review of the need for the continuing confinement of those persons awaiting trial (approximately 25% of the prison population) who were being held on the lowest amounts of bail.[2]

The decree establishing the bail review mechanism specifically authorizes petitioner to object to the "projected release" of any pre-trial detainee by filing written objections. ¶ 7(d). Where necessary, the court is to hold a hearing to resolve petitioner's objections. ¶ 7(f). "Where the Court shall find that release of an individual after a hearing pursuant to paragraph 7(f) . . . would create an immediate threat or danger of injury to the person, or bodily harm to

1. Reproduced Record at 94a.

2. There are approximately 2200 cells in Philadelphia's prisons. When the court issued its decree of March 17, 1981, approximately 3,000 persons were being held. By a separate order not at issue here, the court directed the transfer of 200 prisoners from Philadelphia prisons to State correctional facilities. Opinion in Support of Dismissal of Exceptions of Defendants, Appendix to Brief for Petitioner at B–40 & B–43.

himself or others, such individual shall not be released pursuant to this Order." ¶ 7(h).[3]

Nothing in the decree affects the right of petitioner to obtain appellate review of the trial court's determination. Furthermore, as the court of common pleas has made clear, the review mechanism is a flexible device designed to complement other remedies such as the construction of additional detention facilities.[4]

Petitioner sought leave to intervene on March 27, 1981, ten days after the entry of the court's remedial decree. His stated purpose was to seek "vacation and reconsideration" of the decree of March 17, 1981. Accompanying the application for intervention were the exceptions to the decree which petitioner had planned to file if granted his request. Petitioner appealed the denial of his application for intervention to the Commonwealth Court.[5]

While his appeal to the Commonwealth Court was pending, petitioner filed an application with this Court for a stay of the decree of March 17, 1981, and for the assumption of plenary jurisdiction. By order dated July 7, 1981 (per Nix & Kauffman, JJ.), the March 17 decree was stayed in part, as follows:

"The following detentioners shall not be released absent the posting of bail previously set:

(a) any detentioner charged with the commission of, or attempted commission of, the following offenses: murder, rape, robbery, burglary, aggravated assault, arson, kidnapping, or any crime committed with a deadly weapon;

(b) any other detentioner, the release of whom has been found, in accordance with the procedure provided in paragraph (7) of the . . . order of March 17, 1981 [(see supra

**3.** The decree of March 17, 1981, as modified on June 22, 1981, is reproduced in its entirety as an Appendix to this opinion.

**4.** Opinion in Support of Dismissal of Exceptions of Defendants, supra note 2, at B-44.

**5.** Defendant City officials, who had filed exceptions to the March 17 decree, also filed an appeal to the Commonwealth Court from the dismissal of their exceptions.

text)], to create an imminent threat or danger of injury to the person, or bodily harm to himself or others, or presents a clear risk of failure to appear at scheduled court hearings." [6]

This order was modified on December 16, 1981 (per Nix & Kauffman, JJ.), to exclude from the prohibition against release "[a]ny detentioner charged with the commission of, or attempted commission of, burglary committed without a deadly weapon ...." Petitioner's request for the assumption of plenary jurisdiction was heard by this Court on January 19, 1982.

## II

Pa.R.Civ.Proc. 2329(3) permits a court to refuse an application for intervention if "the petitioner has unduly delayed in making application for intervention ...." Whether an application for intervention is timely is a question "singularly within the periphery of the trial judge's discretionary domain." *Templeton Appeal*, 399 Pa. 10, 17, 159 A.2d 725, 730 (1960). See 8 Goodrich-Amram 2d § 2329:4 at p. 408 (1977) ("wide" discretion in trial court). "[U]nless there is a manifest abuse of such discretion, [the court's] exercise will not be interfered with on review." *Darlington v. Reilly*, 363 Pa. 72, 76, 69 A.2d 84, 86 (1949). Here, as there is no evidence of an abuse of discretion, the trial court's discretion may not be disturbed.

Petitioner asserts that his petition for intervention was timely because the court's remedial decree of March 17, 1981, worked a significant increase in the number of persons subject to possible release over the number subject to possible release under previous remedial decrees. However, the dispositive issue is not whether the March 17 decree worked an increase in the number of persons subject to possible release, but whether petitioner knew or should have known before entry of the decree of the possible remedies that the present litigation was likely to produce. If petitioner knew or should have known of the possible remedies at a time

6. Reproduced Record at 163–64a.

sufficiently prior to the entry of the decree to have provided petitioner an opportunity to intervene, then petitioner must provide a valid explanation for his having taken no action until March 27, 1981, after entry of the decree. Where, as here, there is no explanation for such delay, the application for intervention is properly denied. See *Delaware Valley Citizens' Council for Clean Air v. Commonwealth of Pennsylvania*, 674 F.2d 970, 975 (3d Cir., 1982); *Commonwealth of Pennsylvania v. Rizzo*, 530 F.2d 501, 507 (3d Cir. 1976).

■ Throughout the ten-year history of the controversy over the conditions of confinement at Philadelphia's prisons, the scope of the court's remedial decrees aimed at correcting the overcrowding of Philadelphia's prisons has been directly proportional to the level of overcrowding. In June of 1976, when the court issued its first remedial decree specifically designed to maintain the prison population at an acceptable level (then approximately 1950 inmates), the court directed:

"Within ninety (90) days of the date of this Interim Decree I, the defendants shall develop and implement an administrative mechanism to maintain the population in the three institutions at no greater than the rated level. If the population exceeds this level, persons who are held in default of $1,500 bail or less, starting with those who have been detained for the longest period of time, shall be released on their own recognizance."[7]

When in May of 1980 the court determined that the existing bail review mechanism was inadequate to deal with an increasing prison population, the court enlarged the scope of bail review to include (a) persons held for trial on misdemeanor offenses, (b) persons held in default of $3,000 bail or less, and (c) all others who, if released, would not pose undue danger to the community or undue risk of non-appearance.[8]

The May 1980 decree specifically required that petitioner be given an opportunity to be heard on the release of any pre-trial detainee. In view of petitioner's acknowledged

7. Reproduced Record at 110a.

8. Reproduced Record at 156a.

participation in these bail review proceedings,[9] petitioner must be charged with knowledge of the continuing, persistent problem of overcrowding which led ultimately to the now-challenged decree. We are, therefore, satisfied that petitioner had every reason to know well before entry of the decree of March 17, 1981, that the scope of the court's remedial relief would potentially expand.

Petitioner's reliance upon *Ackerman v. North Huntingdon Township*, 425 Pa. 194, 228 A.2d 667 (1967), is misplaced. There, this Court rejected a claim that intervenors had been dilatory in seeking leave to intervene after the entry of a court decree, within the time allowed for the filing of exceptions. However, critical to the result in *Ackerman* was the fact that the intervenors' interests had been adequately represented by a party-defendant throughout the litigation leading to the entry of the decree.[10] It was only upon the failure of the party-defendant to take exceptions to the decree that the adequacy of representation by the party-defendant deteriorated. Then "it behooved the [intervenors] to act and they acted without delay." 425 Pa. at 197, 228 A.2d at 668. Here, by contrast, petitioner seeks leave to intervene on the ground that his interest in the enforcement of the criminal laws was not adequately represented by the parties-defendant. Indeed, petitioner's argument in support of his claimed right to intervene pursuant to Pa.R.Civ.Proc. 2327 is predicated upon his assertion that he is the "sole" public official in a position to vindicate that interest.[11] Thus, unlike in *Ackerman*, where the intervenors acted promptly upon the deterioration of what had been adequate representation, petitioner took no action during the period when, according to his own argument, he was not represented at all.

9. E.g., Brief for Petitioner at 5.

10. This adequacy of representation would have provided a proper basis for the denial of intervention, had it been sought prior to the entry of the decree. See Pa.R.Civ.Proc. 2329(2).

11. E.g., Brief for Petitioner at A–13.

■ Petitioner's additional contention that plaintiffs are not prejudiced by his belated intervention is equally without merit. Whenever a would-be litigant awaits the outcome of a court proceeding before asserting an interest in the litigation, there is harm to the prevailing party—and to the adjudicatory process itself. As this Court has observed, assertion of rights after the court has acted "results in the trial becoming a dress rehearsal .... The diligent and prepared trial lawyer—and his client—are penalized...." *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 257, 322 A.2d 114, 116 (1974) (party seeking relief on appeal must first have asserted timely objection in trial court).

The fact that the City officials filed exceptions to the March 17 decree does not require a different conclusion. The exceptions of the defendants must be confined to the matters properly placed in dispute prior to the entry of the decree. See, e.g., *Dilliplaine v. Lehigh Valley Trust Co.*, supra. This record is clear that if petitioner were permitted to intervene and to file exceptions reflecting his belief that he has thus far not been adequately represented, petitioner would cause the same harm both to the plaintiffs and to the adjudicatory process as would be caused if the defendants themselves were improperly permitted to raise matters not previously raised.

"[A] motion to intervene after entry of a decree should be denied except in extraordinary circumstances." *Delaware Valley Citizens' Council for Clean Air v. Commonwealth of Pennsylvania*, supra, 674 F.2d at 974. As petitioner has failed to establish the existence of such circumstances, the trial court's denial of relief may not be disturbed.[12]

12. Apart from his failure to establish any circumstances in support of intervention after entry of the decree, petitioner has failed to establish that the denial of intervention has harmed his interests. Petitioner has been invited by the Court of Common Pleas of Philadelphia to submit his views on the appropriateness of both present and future remedies:

"[W]e also go on record as a Court that is willing to take into account the views and opinions of all relevant parties. Petitioner is fully aware of this, having been previously consulted by the parties and the Master on various aspects of this litigation."

## III

Because of our denial of extraordinary relief, the stay previously granted to petitioner pending the resolution of his request for such relief cannot stand. We note, however, that the terms of the stay previously entered substantially reflect the provisions of the trial court's decree, particularly paragraph 7(h), which prohibits release where release "would create an immediate threat or danger of injury to the person, or bodily harm to himself or others . . . ." Thus, even though the stay is vacated, the terms of the stay should not be disregarded in the bail review process.

Petition for extraordinary relief denied and stay vacated. Case remanded to the Commonwealth Court for proceedings consistent with this opinion.

### APPENDIX

| | | |
|---|---|---|
| GERALD JACKSON, et al. | : | COURT OF COMMON PLEAS |
| Plaintiffs | : | TRIAL DIVISION |
| vs. | : | FEBRUARY TERM, 1971 |
| | : | NO. 2437 |
| EDWARD J. HENDRICK, et al. | : | COMPLAINT IN EQUITY |
| Defendants | : | (CLASS ACTION) |

### ORDER

### (MODIFYING ORDER OF MARCH 17, 1981)

AND NOW, this 22nd day of June, 1981, the Court enters the following Order:

*Rated Capacity of Philadelphia Prisons*

1. The rated capacity of Holmesburg Prison shall be six hundred sixty (660) persons.

2. The rated capacity of the House of Correction shall be six hundred eighty (680) persons.

3. The rated capacity of the Philadelphia Detention Center, including the Health Services Wing, shall be eight hundred fifty (850) persons.

Appendix to Brief for Petitioner at B–31. See also Pa.R.A.P. 531 (amicus brief may be submitted as of right to appellate court by "anyone interested in the questions involved in any matter pending").

4. Cells that are not habitable for any reason are not to be included in the rated capacity of the three institutions named above.

*Interim Population Cap*

5. By August 1, 1981, defendants shall reduce the population at the three institutions named above to the rated capacity as above determined.

6. Henceforth, from the date of this Order, triple celling shall be prohibited absolutely.

7. The following procedure shall be implemented to prevent such triple celling:

(a) Defendants within five days of the date of this Order shall state to this Court in writing the figure at which triple celling would be required, and hereafter as circumstances may occur to change that figure shall further state that change to the Court, in writing, within fifteen days of the same.

(b) Defendants shall provide to this Court, the Master, Court Pre-Trial Services, plaintiffs' counsel, the Defender and the District Attorney a daily list of the seventy-five (75) inmates held in the lowest bail, without detainers. The said list shall set forth the charges and date of arrest, and shall list the inmates in order of the lowest bail, with identical bails listed by length of time in custody.

(c) Where commitment of an individual to any of the Philadelphia correction institutions would cause the population to rise above the figure set in 7(a), *supra*, thereby causing triple celling, the Court will order release on personal recognizance of the individual shown on the above described list as held at lowest bail without detainers, preference among identical bails to be determined by longest custody, or, if both bail and length of custody be identical all such individuals to be so released.

(d) The District Attorney may object to the projected release of any individual on the list by filing written

objections no later than two days from the time the list is received. Such objection shall be filed with the Court, with copies to the Master, Pre-Trial services and counsel of record for such individual and shall briefly set forth the reasons for said objection.

(e) The Defender Association (or private counsel) may respond to said objection not later than two days after receipt of a copy of the same as above provided, briefly setting forth the reasons why release should be ordered.

(f) Thereafter, within ten (10) days, the Court shall sustain or dismiss the stated objection, or shall order a hearing if the court shall deem it necessary.

(g) Pending resolution of such objection, the court shall release the next individual on the list noted at 7(a), *supra*, to whose release no objection has been filed by the District Attorney.

(h) Where the Court shall find that release of an individual after a hearing pursuant to paragraph 7(f), *supra*, would create an imminent threat or danger of injury to the person, or bodily harm to himself or others, such individual shall not be released pursuant to this Order.

*Permanent Population Cap*

8. Beginning not later than July 10, 1981, the procedures set forth in paragraph 7, *supra*, shall be applied to further reduce the population to the rated capacity as determined by paragraphs 1–4, inclusive, of this Order by August 1, 1981, and periodically thereafter whenever required, shall be further applied to maintain the population at that level.

9. No inmate in any Philadelphia County correctional institution shall be double-celled after August 1, 1981. The terms of this Order shall be applicable to and shall govern the level of the population of any Philadelphia County correctional institution hereafter established.

10. The procedures set forth in this Order are designed to maintain compliance with this Court's previous Opinions,

Orders and Stipulations and Agreements in this case, and in particular the Order of February 4, 1977, entitling all individuals to single cell occupancy in the County Prison system.

BY THE COURT:
THEODORE B. SMITH, JR.
JUDGE
PAUL A. DANDRIDGE
JUDGE
CALVIN T. WILSON
JUDGE

FLAHERTY, J., joins in this opinion and files a concurring opinion.

NIX, J., files a dissenting opinion in which McDERMOTT and HUTCHINSON, JJ., join.

McDERMOTT, J., files a dissenting opinion.

FLAHERTY, Justice, concurring:

Joining with the majority, I would deny the request for extraordinary relief and leave the matter with the Commonwealth Court for its determination, where the case is properly pending.

NIX, Justice, dissenting.

I must strenuously dissent from the majority's disregard of the importance of the issues presented by prison overcrowding and their understatement of the importance of permitting the District Attorney of Philadelphia, the petitioner, to intervene. Under the guise of finding that petitioner "unduly delayed" in seeking intervention and that ". . . the dispositive issue is . . . whether petitioner knew or should have known before entry of the decree of the possible remedies that the present litigation was likely to produce" (slip op. at 229) the majority incorrectly perceives a dereliction on the part of a public official, when in fact none here exists. As a result of this misguided and tortured reasoning, the safety of the community is unnecessarily imperiled.

Petitioner may have been aware of the instant litigation before he sought intervention, but that fact alone is not dispositive of the inquiry as to whether this Court should allow intervention. Accepting *arguendo* the dereliction of the District Attorney in not previously acting, as the majority charges, I nevertheless reject the fuzzy reasoning, reminiscent of the turbulent '60's, that the public at large should be required to pay the cost. More importantly, it is my view that the District Attorney was correct in his assessment that intervention was not previously required.

The instant litigation was purportedly initiated to alleviate the alleged unconstitutional prison conditions existing in the Philadelphia Prison System. In response, a number of innovative and untried remedies were and are being suggested to resolve perceived injustices. Originally, the remedies designed were directed to the internal institutional capacity of the prisons. This obviously was not an area that the District Attorney, the prosecuting arm of county government, was charged to oversee.

For the first time, in its order of March 17, 1981, amended by the order of June 22, 1981 the court below developed a mechanism for the release of pre-trial detainees which undercut the traditional bail setting process.[1] Without question, the District Attorney has a major role under our law in determining the bail in each instance of one held for court in a criminal case. A primary consideration in the setting of bail is to assure the safety of the general public. Bail Reform Act of 1966, 18 U.S.C., §§ 3146, 3148; *Harris v. U. S.*, 404 U.S. 1232, 92 S.Ct. 10, 30 L.Ed.2d 25 (1971); *U. S. v. James R. Anderson*, 670 F.2d 328 (D.C.Cir.1982); *U. S. v. Provenzano*, 605 F.2d 85 (3d Cir. 1979); *U. S. v. Long*, 422

1. The earlier creation of a release mechanism, in and of itself, is not dispositive of the present inquiry. The scope and effect of that mechanism is the critical element if a proper analysis is to be made. The previous release of a small number of pre-trial detainees did not endanger the District Attorney's overall responsibility to effectively prosecute criminal defendants. However, when the specter of a wholesale release of pre-trial detainees charged with serious crimes became imminent, the cumulative effect of this procedure was to redirect the impact of the instant litigation to the heart of the District Attorney's primary prosecutorial function.

F.2d 712 (D.C.Cir.1970); *U. S. v. Seide*, 492 F.Supp. 164 (D.C.Cal.1980). The District Attorney is charged with the obligation of seeing that this end of the process is accomplished in every case. It should be obvious where that process has taken place and an amount has been established for security upon the release of a pre-trial detainee, any reduction of the amount dehors the bail process undermines the entire structure of the bail process.

It was because of the concern for the safety of the citizenry occasioned by this questionable disregard for the need of adequate security that this writer, joined by the then Mr. Justice Kauffman, modified the order of the court below to exclude from the application of its order those detainees charged with crimes that clearly posed a threat to society. While that modification was intended to provide a temporary amelioration of the effects of the order below, it was not envisioned as a complete rectification for the substitution of the traditional bail process.[2]

The ultimate responsibility for the establishment and sustaining of order and safety of our citizens in this Commonwealth, including this county, rests with the sovereign, the state. Both the prosecution of those violating the criminal laws and the maintainance of those in custody for having violated those laws are carried out by the state directly through county district attorneys or indirectly by political subdivisions that have been delegated the authority to carry out the state's responsibility for its prisons. In the City of Philadelphia, the City Solicitor has been designated the

2. The majority vacates the stay and erroneously concludes the decree of the lower court is sufficient to protect the public and does not constitute an undue burden on the District Attorney. The July 7, 1981 partial stay and modification was specifically designed to prohibit the release of pre-trial detainees charged with the most serious crimes of violence. The necessity for this stay and modification was occasioned by the very fact that pretrial detainees charged with such crimes would be released pursuant to the lower court's decree. That protection has today been removed. Moreover, the majority's conclusion that participation by the District Attorney is sufficient to protect the public's interest ignores reality. The bail review procedure forces the District Attorney's office to expend the valuable resources of an already overburdened staff for a second time after having participated in the original bail-setting process.

public official to execute the city's delegated responsibility to maintain the housing of those charged with crimes. The District Attorney of Philadelphia is the state's designee to carry the onus of law enforcement. *Commonwealth ex rel. Specter v. Bauer*, 437 Pa. 37, 261 A.2d 573 (1970).

This case, evolving from its initial issue of adequate and humane confinement of incarcerated persons, came to involve the very essence of law enforcement (public safety). Today's decision handicaps the representation of the public by eliminating the safety arm of the public's right to an orderly and safe community and leaves the public to be represented only by the City's public official charged with the orderly and humane maintainance of its local prisons.[3] I would not have dismembered the public's interests by denying full participation of the state's law enforcement official.[4]

Accordingly, I would grant the request for extraordinary relief and hold that the District Attorney should be permitted to intervene in the matter before the Commonwealth Court.

Mr. Justice McDERMOTT and Mr. Justice HUTCHINSON join in this opinion.

3. The majority ignores that by its refusal to permit the District Attorney to participate it may in effect have left the people of this county without any effective representation in this extremely important matter. In its adjudication of the original City defendant's exceptions to the Order of March 17, 1981, the lower court dismissed the exceptions, *inter alia*, on the grounds the City defendant failed to file a brief supporting its contentions within the time provided by Philadelphia Civil Rule 240. Should that ruling be upheld by the Commonwealth Court, the merits of this case will escape appellate review.

4. Although the majority expressly purports merely to deny the District Attorney's request for extraordinary relief, it nevertheless appears evident from the opinion that they have also concluded the merits of the appeal of the District Attorney presently before the Commonwealth Court seeking review of the order denying intervention by the court below. From footnote 12 of the opinion, the majority appears to conclude that the only resource now available to the District Attorney is to seek participation as *amicus*. Thus, *sub silentio*, they have exercised their extraordinary power and mooted the appeal of the District Attorney presently pending in the Commonwealth Court.

McDERMOTT, Justice, dissenting.

Before Constitutional concepts are articulated into specific instances, they should be subject to the closest scrutiny and adversarial contest. To deny the District Attorney intervention in this case, for the petty tutorial reasons given, is to deny the court access to another source of argument and analysis. The issues in this case are of profound Constitutional and statutory import; they can only be resolved here. To delay them further by denying intervention and plenary jurisdiction is to use the rod to hurt the teacher.