# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re: Russel Jennings a/k/a "Joey" Jennings, an incapacitated person | : : : : | |
| Appeal of: Department of Human Services | : : | No. 1136 C.D. 2015 |
| | | |
| In Re: Russel Jennings a/k/a "Joey" Jennings, an incapacitated person | : : : : | |
| Appeal of: Pennsylvania Department of Human Services | : : | No. 1254 C.D. 2015 |
| | | |
| In Re: Russel Jennings a/k/a "Joey" Jennings, an incapacitated person | : : : : | |
| Appeal of: Pennsylvania Department of Human Services | : : | No. 1255 C.D. 2015<br>Submitted: February 12, 2016 |

BEFORE:    HONORABLE P. KEVIN BROBSON, Judge
                    HONORABLE PATRICIA A. McCULLOUGH, Judge
                    HONORABLE DAN PELLEGRINI, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
SENIOR JUDGE PELLEGRINI                    FILED: March 8, 2016


The Pennsylvania Department of Human Services (Department) appeals from orders of the Orphans' Court Division of the Tioga County Court of Common Pleas (trial court) denying, *inter alia*, the Department's petition to

intervene filed after the trial court issued an order committing Russel "Joey" Jennings (Jennings) on the basis that the petition was unduly delayed.[1]  For the reasons that follow, we affirm.

**I.**

Jennings is a 23-year old adult with intellectual disabilities which manifested before his 18th birthday and may continue for an indefinite period of time.  Over the years, he has received inpatient and pharmacological psychiatric treatment for his disabilities and has been housed in various community group home facilities.[2]  Since entering the community group home setting, Jennings has been admitted to five different psychiatric hospitals for crisis management and has been put on at least 17 different psychotropic medications and combinations thereof.

From about February 2014, Jennings has resided at Bancroft Walker Community Group Home (Bancroft), a one-person group home with two staff members supporting him 24 hours per day.  At Bancroft, Jennings' living arrangements have been individualized to meet his behavioral needs.  He has not taken any psychotropic medication since May 2014, has not been admitted into

---

[1] Appellees were precluded from filing a brief.

[2] Jennings lived in a campus residential environment before "aging out" of the system. He subsequently entered the community group home setting.  Over the course of a two-year period, Jennings was discharged from three community group homes because the group homes could not safely manage his behavior.

inpatient psychiatric care since July 2014, and has not been physically restrained since August 2014.

Jennings' parents, Richard and Susan Jennings (collectively, Jennings' parents), who are also his legal guardians, have been dissatisfied with his care at Bancroft. As a result, in February 2015, Jennings' parents filed a petition for court commitment pursuant to Section 406 of the Mental Health and Mental Retardation Act of 1966, 50 P.S. §4406,[3] to commit Jennings to either Woods

_____

[3] Mental Health and Mental Retardation Act of 1966, Act of October 20, 1966, Special Sess., P.L. 96, *as amended*, 50 P.S. §4406. 50 P.S. §4406 provides:

> (a) Whenever a person is believed to be mentally disabled, and in need of care or treatment by reason of such mental disability, and examination of such person has been made by a physician or physicians, or for any reason the examination of such person cannot be made, a petition may be presented to the court of common pleas of the county in which a person resides or is, for his immediate examination or commitment to an appropriate facility for examination, observation and diagnosis.
>
> (1) The petition may be made by a relative, guardian, friend, individual standing in loco parentis or by the executive officer or an authorized agent of a governmental or recognized nonprofit health and welfare organization or agency or any responsible person.
>
> (2) The petition shall set forth the facts upon which the petitioner bases his belief of mental disability and the efforts made to secure examination of the person by a physician.
>
> (3) Said court upon consideration of such petition shall: (i) issue a warrant requiring that such person be brought before said court; (ii) fix a date for a hearing which shall be as soon as the warrant is executed, and (iii) notify the parties in interest.

**(Footnote continued on next page…)**

Services (Woods), a campus-based setting, or White Haven ICF/ID (White Haven), a congregate setting, alleging that these programs offer the least-restrictive environment conducive to Jennings' health and welfare.

In their petition, Jennings' parents allege that because Jennings lives in a single-person group home, he has no social interactions except with the on-duty staff and that he is not allowed many outings in public. They allege that he is "very unhappy" at Bancroft, and that he told them "that the place is horrible and that the staff is very mean to him" and that he "repeatedly begs [them] to go to a new place." (Reproduced Record (R.R.) at 13a.) They also allege that the police have been called multiple times. They claim that the Bancroft staff sexually

---

**(continued…)**

(4) After hearing, said court may: (i) order an immediate examination by two physicians appointed by said court, or (ii) order the commitment of the person believed to be mentally disabled, to a facility for a period not exceeding ten days for the purpose of examination. If the examination can be accomplished by partial hospitalization said court may so direct.

(b) If, upon examination, it is determined that such person is in need of care at a facility, the examining physicians or director, as the case may be, shall immediately report to said court which may order the commitment of such person for care and treatment.

In its order of commitment, said court may permit partial hospitalization or outpatient care, or if at any time thereafter the director shall determine such partial hospitalization or outpatient care to be beneficial to the person so committed, the same may be permitted by said court upon application by the director.

harassed Jennings' behaviorist when she went to meet with Jennings and that because she rejected their advances, "they retaliated by declining to cooperate with her behavior protocol for [Jennings]. Her manager decided to pull her out of the home due to the harassment, which has resulted in [Jennings] not receiving his [Individual Support Plan (ISP)] service for over six months now [*sic*]." (*Id.* at 13a-14a.) Finally, Jennings' parents allege that Jennings qualifies for the Intermediate Care Facilities for Individuals with Mental Retardation (ICF/MR)[4] level of care, and that "an enclosed, predictable campus environment" such as Woods, or an Intermediate Care Facility for Individuals with Intellectual Disabilities (ICF/ID)[5]

---

[4] Jennings's mother, Mrs. Jennings, later testified as to how she was aware of the fact that Jennings qualifies for Intermediate Care Facilities for Individuals with Mental Retardation (ICF/MR), also known as Intermediate Care Facility for Individuals with Intellectual Disabilities (ICF/ID):

> Because under Federal and State Medicaid Law he is able to choose whether he wants to go -- or we as guardians, on his behalf, are able to choose whether he can go into a Waiver or whether he can go into an ICF/ID.
>
> Now, [the Department] put him on a waiting list for a private ICF/ID in the state. Private ICF/ID's [*sic*] are few and far between and they are mostly full, and a lot of them only treat the medically fragile people. The only ICF/ID that is available to him is the public ICF/ID. And they have never shown me a statute or regulation that designates that only a private ICF/ID may be chosen. He has a right to choose.

(R.R. at 27a-28a.)

[5] ICF/MRs, now called ICF/IDs, were created by the federal government under Medicaid to provide long-term institutional care for individuals with intellectual disabilities. Only certain types of facilities are designated as ICF/IDs, and states that choose to provide ICF/ID care have to meet strict certification and licensing standards that are developed by the federal government. There are both public and private ICF/IDs; the public ones are run by the state. (R.R. at 44a.)

such as White Haven, would be the best fit for him as it would keep him safe but also provide a good quality of life.

## II.

## A.

A hearing on the matter was held before the trial court on May 29, 2015. The Department was notified of the hearing approximately four months before the hearing but failed to attend.[6] Jennings was represented at the hearing by court-appointed counsel and a guardian *ad litem*.[7] Jennings' counsel explained that he was not able to communicate with Jennings to understand what he wants and felt that he could not advocate for Jennings.[8]

---

[6] Before the trial court judge, Tiffany Cummings, Jennings' parents' counsel, explained that Jennings' parents attempted to switch him to an Intermediate Care Facility per a behaviorist's recommendation; however, the Department denied the move, determining that his current housing is adequate and that he cannot be moved if he has adequate housing. Attorney Cummings stated that although the Department was not served with a copy of the petition because it is not considered a party to the action, she spoke with a Department attorney, who informed her that the Department did not intend to participate in the matter.

[7] A guardian *ad litem* is a court-appointed licensed attorney or licensed mental health professional who represents the best interests of the dependent child in court proceedings. *See* 42 Pa. C.S. §6311.

[8] Daniel A. Stefanides, Jennings' counsel, stated in pertinent part:

> …I've had no shortage of people try to tell me what my [role] would be in this hearing… not surprisingly their thoughts on what I should – I'm supposed to do align perfectly with what they want, but after thinking long and hard on the issue I was appointed to represent Joey's legal interests. He -- I'm not really able to communicate with him to know what he wants in this situation, so that – I'm kind of limited in, I think, what I'm allowed to do, or

**(Footnote continued on next page…)**

6

Jennings' mother (Mrs. Jennings) testified that Jennings went from community group home to community group home, with inpatient stays at psychiatric hospitals. Mrs. Jennings testified to several incidents that arose from Jennings' violent behavior during his time at the community group homes. She stated that his violent behavior continued at Bancroft, including multiple incidents of property destruction. She recalled that Jennings had been neglected at Bancroft, that she had found him unclean and after she bathed him, she could not find a single clean towel in his house. She testified that his lack of hygiene led to a rash on his body that was later diagnosed as contact dermatitis. She testified that he was taken to see a pornographic movie. She stated that he was fed unhealthy foods, such as chicken nuggets, fish sticks and pizza, which caused him to gain a lot of weight. She concluded that before Jennings was placed at Bancroft, he was happy, healthy and used to have friends but is now isolated and has very minimal to no social interaction.

With regard to the appropriateness of White Haven, Mrs. Jennings testified that:

> White Haven is an ICF/ID an Intermediate Care Facility.
> It is an enclosed campus. There's a workshop on

**(continued…)**

> supposed to do in this case. So, I don't really have any position because I can't -- I don't know Joey's position, so I can't advocate[] for him, Your Honor.

(R.R. at 19a.)

7

campus. There's a swimming pool on campus. There's, there are professional people on campus, doctors and nurses. We've been there three times. They had a family picnic there. They had it catered. They had a band. Staff members got on the stage with the band and sang and danced. Everyone was having a wonderful time. We were deeply impressed.

We talked to other parents and they were exceedingly happy with the care their children were getting. One of the residents bicycled by us, stopped, sat at our table and talked, and conversed with us for quite a long time. They showed us the facility. They had Plexiglas on the windows, strong thick walls. It just looked, it just looked ideal. And it's only two and a half hours away from us.[9]

(*Id.* at 27a.) She explained that Jennings was shown both Woods and White Haven, and that he loved Woods. She described Woods as a safe, closed campus residence, where the residents live in cottages. It contains a workshop and a pool, arranges social activities, and provides an interdisciplinary team of professionals who map out behavioral therapeutic interventions for residents. She testified that the one downside to Woods is that it is farther away than White Haven.

Joseph Kendorski (Kendorski), a certified behavior analyst who has worked primarily with adults with developmental disabilities, testified that he visited Jennings three days in August 2014 and performed a behavioral assessment on him in order to increase his positive behaviors and decrease his challenging

---

[9] Mrs. Jennings later explained that Jennings' family would be able to visit him more often given White Haven's close proximity.

behaviors.  He stated that based on his assessment, he recommended that Jennings be treated by a Board Certified Behavior Analyst who is highly trained in the principles of applied behavior analysis pursuant to the best practices for individuals with developmental disabilities, but that Bancroft did not employ such an analyst. He also noted that the Bancroft staff hardly interacted with Jennings, and that he did not see any opportunity for Jennings to actively participate in conversation or any activity with a staff member or peer.  He explained that that type of proactive engagement would be helpful in mitigating some of his bad behaviors.  He further opined that if Jennings "had an opportunity to be in a living environment, which has access to… maybe like a club or a certain social activity where he was with peers, who share his similar interests, that it would certainly provide a high quality of life for [him]…."  (*Id.* at 37a.)  Lastly, Kendorski testified that Jennings' current environment at Bancroft was not ideal with regard to safety, and that he thought a more congregate setting, with more clinical support and a more structured schedule, would be better.

Dr. Zinoviy Gutkovich (Dr. Gutkovich), a physician who is board certified in general psychiatry and child and adolescent psychiatry, testified that in July 2013, he conducted a psychiatric evaluation of Jennings over Skype,[10] during

---

[10] Dr. Gutkovich explained that the evaluation took place over Skype because Horsham Clinic, the facility that Jennings was in at the time, did not allow him to leave the premises due to safety concerns over his behavioral outbursts.

which he interviewed Jennings directly.[11] Dr. Gutkovich opined that Jennings is an "agreeable person, he likes to interact with people" and that his outbursts occur when he feels frustrated, trapped, or threatened. (*Id.* at 41a.) Dr. Gutkovich opined that the best environment for Jennings would be a campus-based environment that is a:

> …[H]ighly structured supportive therapeutic environment with highly trained staff. That such environment should provide a possibility of use of restraints, not as in chemical restraints, in other words other than medicating him during an episode of agitation and such environment should provide, provide [*sic*] safety crisis interventions. And what I mean by that is there should be sufficient amount of highly trained staff who can restrain, in the worst case scenario, he goes into severe agitation, could restrain him safely without injuring him [*sic*].
>
> ***
>
> …[S]o this environment that would be most appropriate for [Jennings] should be promoting his personal growth. It should promote his socialization, should promote his independence, should provide him with training of, of [*sic*] living skills and/or job skills.

(*Id.* at 41a.)

---

[11] Dr. Gutkovich stated that his testimony is based on his evaluation and documents, including inpatient discharge summaries and a functional behavioral assessment, that occurred after his evaluation.

Renee Fraiser, the Director of Mental Health, Early Intervention and Intellectual Disability Services for Service Access Management on behalf of Tioga County, testified that she was Jennings' first Supports Coordinator and used to visit him once per year until he turned 21. She testified to Jennings' various moves and stated that he has had fewer incidents during his time at Bancroft than at any other group home. She testified that Bancroft has taken a lot of steps in making Jennings' placement work. She stated that based on her experience with ICF/IDs, if Jennings were to be transferred to one, he would be limited in his interactions with other individuals because the majority of individuals at those facilities are elderly and medically fragile. She testified that ICF/IDs and campus-based facilities are more restrictive and regimented, which may not be the right setting for Jennings as he would have fewer choices.

Following the hearing,[12] the trial court ordered that Jennings be committed to White Haven, thereby mandating that the Department relocate him to that facility.[13]

---

[12] On June 22, 2015, the trial court also issued Findings of Fact accepting the testimony of Jennings' parents' witnesses. We note that those findings were issued after the trial court denied the Department's petition to intervene.

[13] The Department is obligated to operate its facilities in accordance with applicable court orders. *See Goldy v. Beal*, 429 F. Supp. 640 (M.D. Pa. 1976). As such, the Department is bound to admit persons who have been involuntarily committed. *See In re Bishop*, 717 A.2d 1114 (Pa. Cmwlth. 1998).

**B.**

On June 3, 2015, the Department filed a petition for intervention, a motion for reconsideration, or, in the alternative, for post-trial relief, and a motion for stay or supersedeas. The trial court held a hearing and allowed the Department to present evidence.

Holly Lynott (Lynott), the Facility Director at White Haven, testified that, *inter alia*, a court order is required for an individual to be admitted to White Haven because state centers have been closed for admission for a long time. She explained that pursuant to the Americans with Disabilities Act, 42 U.S.C. §12132, and *Olmstead v. L.C.*, 527 U.S. 581 (1999), the Department has the responsibility to ensure that individuals are being served in the least restrictive setting as possible, and that White Haven is the most restrictive setting because it is not integrated as everyone residing at the facility is a person with an intellectual disability. She testified that at White Haven, residents can work in various settings, participate in arts and crafts, go swimming, and partake in other recreational activities depending on the individual's interests and skills. She also stated that residents can participate in off-campus activities. Lynott explained that at White Haven, diets are set by physicians but that the individual's preferences are respected. Lynott testified that White Haven has an aging population, with the average age of residents being 60.

Samuel Freedman (Freedman), Bancroft's Senior Program Associate, testified that he is Jennings' program supervisor and that he provides his care and services. He testified that he spends up to 16 hours a day with Jennings, almost

seven days a week. He testified that at Bancroft, Jennings had "good interaction" with his peers; that he would go visit other homes and have meals with his peers. (R.R. at 70a.) He testified that Jennings leaves his group home to go out and partake in activities almost daily, and that he is asked what he would like to do for his activities. Freedman testified that Jennings' behavior has improved during his time at Bancroft and attributed it to his relationship with the staff.

The trial court denied the Department's petition to intervene, finding that the Department had unduly delayed in filing it.[14] In making its determination, the trial court acknowledged the appropriateness of the Department's participation in the matter though a petition to intervene was not at issue. Rather, the trial court reasoned that the Department had been notified about the commitment petition and the date of the hearing more than three months prior to the hearing and yet, despite its awareness of the commitment petition, sought intervention after the trial court had already adjudicated the matter. The trial court also denied the Department's motions for reconsideration or, in the alternative, for post-trial relief and for stay or supersedeas.[15]

---

[14] In its order denying the Department's petition to intervene, the trial court noted that its intention was to have denied the petition on June 18, 2015, the same date as its orders denying the Department's other motions.

[15] The Department has appealed from each of these determinations.

13

**III.**

On appeal,[16] the Department argues that the trial court abused its discretion because the Department was not unduly delayed in filing its petition to intervene. Specifically, the Department relies on *Ackerman v. North Huntingdon Township*, 228 A.2d 667 (Pa. 1967), and argues that it reasonably relied on Jennings' counsel to protect the parties' common interests, and when it learned that its interests had not been represented, it acted quickly to intervene, filing its petition within one week after entry of the involuntary commitment order.

Whether intervention is permissible in an action is within the trial court's discretion. *Vartan v. Reed*, 677 A.2d 357, 360 (Pa. Cmwlth. 1996). Pursuant to Pennsylvania Rule of Civil Procedure No. 2327(4), a party that is not already a party to an action shall be permitted to intervene if the determination of the action affects a legally enforceable interest of the proposed intervenor. Rule No. 2329(3) further provides that a petition for intervention may be denied if "the petitioner has unduly delayed in making application for intervention…." Pa. R.C.P. No. 2329(3). Whether an application for intervention is timely is a question "singularly within the periphery of the trial judge's discretionary domain." *Jackson v. Hendrick*, 446 A.2d 226, 228-29 (Pa. 1982). "[U]nless there is a manifest abuse of such discretion, [the court's] exercise will not be interfered with on review." *Id.* (quoting *Darlington v. Reilly*, 69 A.2d 84, 86 (Pa. 1949).)

---

[16] Our scope of review of a trial court order disposing of a petition to intervene is whether the trial court abused its discretion or committed an error of law. *Acorn Development Corporation v. Zoning Hearing Board of Upper Merion Township*, 523 A.2d 436 (Pa. Cmwlth. 1987).

14

In determining whether a person should be allowed to intervene after a case has been decided, our Supreme Court, again, in *Jackson*, stated that:

> [i]f petitioner knew or should have known of the possible remedies at a time sufficiently prior to the entry of the decree to have provided petitioner an opportunity to intervene, then petitioner must provide a valid explanation for his having taken no action…[until] after entry of the decree. Where…there is no explanation for such delay, the application for intervention is properly denied.

*Id.* at 229.

The Department argues that it thought that court-appointed counsel and a guardian *ad litem* would protect its interests and that its explanation is sufficient under *Ackerman* to require its intervention. In that case, our Supreme Court allowed intervention after the trial court had entered its order, holding that the intervenors "had a right to assume that their interest would be protected by the township in the litigation." *Ackerman*, 228 A.2d at 668. However, in *Jackson*, our Supreme Court differentiated between when intervention is proper due to reliance on a litigant and when it is not:

> [In *Ackerman*], this Court rejected a claim that intervenors had been dilatory in seeking leave to intervene after the entry of a court decree, within the time allowed for the filing of exceptions. However, *critical to the result in Ackerman was the fact that the intervenors' interests had been adequately represented by a party-defendant throughout the litigation* leading to the entry of the decree. It was only upon the failure of the party-

15

defendant to take exceptions to the decree that the adequacy of representation by the party-defendant deteriorated. Then "it behooved the [intervenors] to act and they acted without delay." … 228 A.2d at 668. *Here, by contrast, petitioner seeks leave to intervene on the ground that his interest in the enforcement of the criminal laws was not adequately represented by the parties-defendant. Indeed, petitioner's argument in support of his claimed right to intervene pursuant to Pa.R.Civ.Proc. 2327 is predicated upon his assertion that he is the "sole" public official in a position to vindicate that interest. Thus, unlike in Ackerman, where the intervenors acted promptly upon the deterioration of what had been adequate representation, petitioner took no action during the period when, according to his own argument, he was not represented at all.*

446 A.2d at 229-30 (emphasis added).

Here, the Department was notified of the hearing to commit Jennings but chose not to appear despite claiming it has enforceable interests in the matter.[17] It also knew that a possible outcome was a change in Jennings' commitment to another type of facility. Notwithstanding all of that, it waited until the case was decided to file a petition to intervene, using the excuse of misplaced reliance upon

---

[17] The Department lists its interests in this matter in both its petition to intervene and its brief. Its interests include its authority to designate the types of individuals to be received at state centers pursuant to Section 303(2) of the Public Welfare Code, Act of June 13, 1967, P.L. 31, *as amended*, 62 P.S. §303(2); its authority to enforce 55 Pa. Code §6250.11, which pertains to specific conditions upon which an individual may be committed; its ability to comply with the Americans with Disabilities Act, 42 U.S.C. §12132, as interpreted by the United States Supreme Court in *Olmstead v. L.C.*, 527 U.S. 581 (1999); and its obligation to admit Jennings because it is mandated to admit involuntarily committed persons.

court-appointed counsel and a guardian *ad litem* to protect its interests. What that excuse ignores is that Jennings' counsel or guardian *ad litem* was not participating to protect the Department's interests but rather, Jennings' interest, making the Department's reliance on those parties to protect whatever interests it may have had unjustifiable. If the Department wanted its position to be considered, it should have presented testimony during the first hearing rather than making excuses after a decision was made.

Accordingly, because the trial court did not manifestly abuse its discretion in determining that the Department inexcusably and unduly delayed the filing of its petition for intervention, we affirm the trial court's decision denying intervention in an already decided case.[18]

_____
DAN PELLEGRINI, Senior Judge

---

[18] Based on the disposition of the case, we decline to address the other issues raised by the Department.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re: Russel Jennings a/k/a "Joey" Jennings, an incapacitated person | : : : : | |
| Appeal of: Department of Human Services | : : | No. 1136 C.D. 2015 |
| In Re: Russel Jennings a/k/a "Joey" Jennings, an incapacitated person | : : : : | |
| Appeal of: Pennsylvania Department of Human Services | : : | No. 1254 C.D. 2015 |
| In Re: Russel Jennings a/k/a "Joey" Jennings, an incapacitated person | : : : : | |
| Appeal of: Pennsylvania Department of Human Services | : : | No. 1255 C.D. 2015 |

# **O R D E R**

AND NOW, this 8th day of March, 2016, the orders of the Orphans' Court Division of the Tioga County Court of Common Pleas in the above-referenced matter are affirmed.

_____

DAN PELLEGRINI, Senior Judge